**Marquis Aurbach**
Brian R. Hardy, Esq.
Nevada Bar No. 10068
Harry L. Arnold, Esq.
Nevada Bar No. 15866
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
bhardy@maclaw.com
harnold@maclaw.com
*Attorneys for Defendant Donald John Trump*

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JOHN ANTHONY CASTRO,<br><br>                             Plaintiff,<br><br>     vs.<br><br>SECRETARY OF STATE FRANCISCO V. AGUILAR; DONALD JOHN TRUMP,<br><br>                             Defendant. | Case Number:<br>2:23-cv-01387-RFB-BNW<br><br>**DEFENDANT DONALD JOHN TRUMP'S OPPOSITION TO EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND EXPEDITED PRELIMINARY INJUNCTION HEARING CONSOLIDATED WITH A PRELIMINARY BENCH TRIAL ON THE MERITS (ECF 9, 11)** |

Defendant Donald John Trump ("President Trump"), by and through the undersigned counsel, the law firm of Marquis Aurbach, hereby opposes Plaintiff John Anthony Castro ("Plaintiff" or "Castro")'s Emergency Application for a Temporary Restraining Order and Expedited Preliminary Injunction Hearing Consolidated with a Preliminary Bench Trial on the Merits (the "Application"). This opposition is based on the papers and pleadings on file herein, and the below memorandum of points and authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Plaintiff seeks injunctive relief to keep President Trump off the ballot in Nevada according to a misunderstood—and flatly wrong—legal theory under Section Three of the Fourteenth Amendment (hereafter, "Section Three"). For the reasons stated herein, this Court

MAC:00002-216 17466-1 5226854_5

should deny all requested injunctive relief, and certainly not hold any expedited hearing consolidated with a trial on the merits.

As an initial matter, this is not the first time Plaintiff has attempted to invoke a federal court's emergency procedures, only to have those emergency applications swiftly denied.[1] This Court need not, and should not, countenance such misuse of its emergency procedures and flouting of its rules. To the contrary, this Court both can and should deliver a clear message that litigants—especially vexatious litigants who claim to be lawyers—must obey those rules. In any event, as Plaintiff is not likely to succeed on the merits of his claims, the Application should be summarily denied.

## II.   <u>SUMMARY OF ARGUMENT</u>

Plaintiff claims he is suffering "irreparable competitive injuries" because Trump is "siphoning off votes and contributions…putting Plaintiff at both a voter and donor disadvantage." *See* ECF Nos 9, 11 at pg. 6. This assertion ignores basic, undeniable facts about Nevada election law and procedure, and rests entirely on impermissible speculation.

Plaintiff's Application conspicuously makes no reference to Nevada-specific election law whatsoever, which should not come as a surprise since Plaintiff has endeavored to recycle the same generic template for relief in federal courts throughout the country. NRS 298.660 sets forth the following:

> If a person who is a qualified candidate to be a major political party's nominee for President of the United States wants to appear on the ballot for a presidential preference primary election that is held for the party, the person must, not earlier than October 1 and not later than 5 p.m. on October 15 of the year immediately preceding the presidential preference primary election, file with the Secretary of

---

[1] *See, e.g.*, *Castro v. Jacobsen et al*, No. 6:23-cv-0062 (D.MT Sept. 20, 2023) (Emergency Application for Temporary Restraining Order denied) (ECF No. 8); *Castro v. Warner et al*, No. 2:23-CV-00598 (S.D.W. Va. Sept. 28, 2023) (application for temporary restraining order recommended to be denied) (ECF No. 13); *Castro v. SC Elections Commission et al*, Case No. 3:23-4501-MGL-SVH (Sept. 27, 2023 D.S.C.) (application for temporary restraining order recommended to be denied) (ECF No. 16); *Castro v. Fontes et al*, Case No. 2:23-cv-01865 (D. Ariz. Sept. 18, 2023) (application for temporary restraining order denied) (ECF Nos. 11-12).

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

State a declaration of candidacy in the form prescribed by the Secretary of State.

Plaintiff's claim that he desperately needs relief "prior to the commencement of the State Presidential Primary filing period"[2] is belied by his stated intent to "file his declaration of write-in candidacy."[3] Plaintiff has thus failed to clearly plead as a threshold matter that he intends to compete against President Trump in the Nevada Republican primary prescribed by NRS 298 *et seq*. That provision makes no reference to "write-in" candidacies and every candidate who files paperwork pursuant to NRS 298.660 above is required to appear on the primary ballot pursuant to NRS 298.670(1). Plaintiff has therefore filed suit and sought emergency injunctive relief without even bothering to familiarize himself with basic tenets of Nevada election law.

Had Plaintiff endeavored to do basic due diligence prior to filing suit, he would have seen that a Nevada Republican primary will not even be held in the event that only one qualified candidate files a declaration of candidacy. *See* NRS 298.650(1). This is in fact a very real possibility, considering that the Nevada Republican Party has publicly announced that it elected not to utilize the state-run primary (which is non-binding) set forth in NRS 298 *et seq.* for awarding delegates to the national convention, and that any candidate who participates in the state-run primary will be ineligible to be awarded any delegates.[4] The Nevada Republican

---

[2] *See* ECF No. 9 at pg. 6.

[3] *Id.* at pg. 5.

[4] Nevada Republican Party, *PRESS RELEASE: Nevada Republicans Will Conduct First in the West Caucus on February 8, 2024, With Voter ID, Paper Ballots, And Results Released the Same Night*, https://nevadagop.org/press-release-nevada-republicans-will-conduct-first-in-the-west-caucus-on-february-8-2024-with-voter-id-paper-ballots-and-results-released-the-same-night/ (last accessed October 1, 2023); *see O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Party is instead using a party-run caucus to award delegates. The Nevada Secretary of State plays no role in whatsoever in a Republican Party caucus. For this reason, it is likely, if not a certainty, that no viable Republican presidential candidate will be participating in the Nevada Republican primary (if it even occurs) since it would render them ineligible to receive delegates. Indeed, President Trump has already affirmed his participation in the caucus rather than the primary,[5] meaning Plaintiff's lawsuit is effectively seeking to deny President Trump ballot access to a primary he will not even be participating in – the epitome of mootness.

Simply put, and in light of the foregoing, Plaintiff is not suffering from any "siphoning of votes" away from him for the simple reason that no votes in Nevada are presently being cast, nor will they be cast for months. Not only are no votes being cast, but there are not yet any candidates in the Nevada primary to vote for (and there may never be). Plaintiff makes no effort to explain how he can be losing votes in an election in which no candidates have declared their intention to run under Nevada law. Plaintiff expects this Court to make illogical leaps and connect the dots for him. But respectfully, this is not this Court's burden, but rather the responsibility of Plaintiff – who has demonstrably failed to offer this Court any factual or legal basis for the relief he seeks.

Beyond this, Plaintiff's claim rests entirely on his baseless speculation—unsupported by any admissible evidence indicating its likely truth—that but for President Trump's presence in the campaign, votes and donations would flow to him (during his write-in campaign) as opposed to candidates whom people have actually heard of. To put it charitably, Plaintiff has never won an election, has no support in any poll, and has been endorsed by no

---

[5] Gabe Stern, *Donald Trump commits to Nevada caucus as state GOP approves rules rivals see as helping his campaign*, ASSOCIATED PRESS (Sept. 23, 2023), https://apnews.com/article/nevada-gop-donald-trump-caucus-066ce2bc1a272650d944c61f1d73cdc2.

MAC:00002-216 17466-1 5226854_5

one. Plaintiff's obscurity is not relative and attributable to President Trump—it is absolute. The reason he will get no votes and no contributions—no matter who is running—is that no one has ever heard of him. Certainly, he has offered no evidence, as opposed to speculation untethered to reality, to support his claim to the contrary.

Two recent magistrate judges analyzed the instant Plaintiff's claims for injury at length and issued their recommendations to the court. In the magistrate judge's recommendation to the United States District Court for the Southern District of West Virginia regarding Plaintiff's motion for temporary restraining order, the judge stated:

> However, the Plaintiff has failed to provide specific facts showing immediate and irreparable injury . . . . While he argues that he is "already suffering irreparable competitive injuries because Defendant Donald John Trump . . . . is siphoning off votes and contributions" from him, the Plaintiff fails to provide any specific facts in support of this allegation or forecast in what way this alleged damage may be impacted by the commencement of West Virginia's presidential primary filing period. *Id.* Although he may be correct that "votes cannot be redistributed once cast" and "financial contributions cannot be refunded once given," the Plaintiff does not indicate what specific votes or contributions have been or will be siphoned off from his campaign during the expediated timeline he has requested: the Plaintiff asserts that both he and Defendant Trump are "pursuing the same voter and donor pies" (ECF No. 1 ¶30) – but this is an insufficient showing of immediate and irreparable injury. *See Castro v. Warner et al*, No. 2:23-CV-00598 (S.D.W. Va. Sept. 28, 2023) (ECF No. 13 at pg. 7)

The magistrate judge for the United States District Court for the Southern District of West Virginia borrowed heavily from the recommendation emanating from the United States District Court for the District of South Carolina, issued just one day before. *See Castro v. SC Elections Commission, Executive Director Howard M. Knapp*, No. 3:23-4501-MGL-SVH (D.S.C. Sept. 27, 2023) *(*application for temporary restraining order recommended to be denied) (ECF No. 16).

Even if this Court were to look past the glaring facial deficiencies with Plaintiff's claims of irreparable injury (which it should not do), Plaintiff is still not entitled to any

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:00002-216 17466-1 5226854_5

injunctive relief. Indeed, Plaintiff is unlikely to prevail on the merits of his claims for a myriad of reasons. First, federal courts, like this one, lack the power to decide the nonjusticiable political questions presented here, especially when such questions are reserved solely for Congress and the Electoral College. Second, the Fourteenth Amendment is not self-executing when used offensively and requires enforcement mechanisms from Congress. Third, the complaint fails to adequately allege a violation of Section Three because President Trump is not even subject to the disqualification clause contained therein. Fourth, Plaintiff lacks standing because he cannot plausibly establish injury, causation, or redressability. And fifth, Plaintiff's claims, to the extent they were ever valid, are entirely moot since President Trump is not participating in the state-run primary. Thus, for all these reasons, Plaintiff is unlikely to prevail on the merits, and his Application should be denied.

## III.    LEGAL STANDARDS

### A.    EMERGENCY MOTIONS

For requests that seek judicial relief on an "emergency basis," the District of Nevada, pursuant to LR 7-4, imposes both procedural and substantive requirements. First, any emergency motion must "be accompanied by an affidavit providing several key facts necessary for the Court to determine whether, in fact, an emergency exists and allowing the Court to provide the fairest, most efficient resolution." *See, e.g.*, *Cardoza v. Bloomin' Brands, Inc.*, 141 F. Supp. 3d 1137, 1142 (D. Nev. 2015). Importantly, this affidavit must offer the court a "detailed description of the nature of the emergency," and if no notice is provided, a "detailed explanation of why it was not practicable to provide that notice." *Id.* In conjunction with this notice requirement, a party moving for emergency relief must attempt to engage in a "meet-and-confer process to resolve the dispute" or offer sufficient detail for the court to determine that such a meet and confer was not necessary. *See* LR 7-4(a)(3).

MAC:00002-216 17466-1 5226854_5

On a substantive basis, a movant requesting emergency relief must show "(1) that it will be irreparably prejudiced if the Court resolves the motion pursuant to the normal briefing schedule and (2) that the movant is without fault in creating the crisis that requires emergency relief, or at the very least that the crisis occurred because of excusable neglect." *Cardoza*, 141 F. Supp. 3d at 1142. Given the high procedural and substantive burden a party moving for emergency relief must satisfy, this District has determined emergency motions should proceed "in only very limited circumstances." *See, e.g.*, *Herndon v. City of Henderson*, No. 219CV00018GMNNJK, 2020 WL 5502155, at *1 (D. Nev. Sept. 11, 2020).

## B. PRELIMINARY INJUNCTIONS / TEMPORARY RESTRAINING ORDERS

To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the plaintiff, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (alternatively providing that that a plaintiff must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the plaintiff's favor, and (4) an injunction is in the public interest).

The analysis for a temporary restraining order ("TRO") is "substantially identical" to that of a preliminary injunction. *Stuhlbarg Intern. Sales Co, Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). In addition, a court may only issue a TRO without notice to the opposing party if (1) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and (2) the moving party's attorney provides a written certification of its efforts to provide notice and why notice should not be required. Fed. R. Civ. P. 65(b)(1).

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**C.     CONSOLIDATING PRELIMINARY INJUNCTION HEARING WITH A TRIAL ON THE MERITS**

The U.S. Supreme Court has observed that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). As such, and given the "haste" customarily involved with a preliminary injunction, "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *See id.* The Ninth Circuit is quite clear that in the limited circumstance in which a preliminary injunction hearing is consolidated with a trial on the merits, a court must provide "the parties with 'clear and unambiguous notice [of the intended consolidation] either before the hearing commences or at a time which will afford the parties a full opportunity to present their respective cases.'" *Isaacson v. Horne*, 716 F.3d 1213, 1220 (9th Cir. 2013) (citation omitted).

## IV.    LEGAL ARGUMENT

### A.     THIS CASE PRESENTS A NONJUSTICIABLE POLITICAL QUESTION

Our Constitution commits to Congress and the Electoral College exclusive power to determine presidential qualifications and whether a candidate can serve as President. Courts cannot decide the issue at the heart of this case. Federal and state courts presented with similar cases challenging the qualifications of presidential candidates have uniformly held that they present nonjusticiable political questions reserved for those entities. This Court should do likewise.

Political questions are nonjusticiable and are therefore not cases or controversies. *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007). The United States Supreme Court set out broad categories that should be considered nonjusticiable political questions in *Baker v. Carr*, 369 U.S. 186, 217 (1962):

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; [and 6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Numerous courts have held that similar challenges to the qualifications of presidential candidates present nonjusticiable political questions. A spate of lawsuits were filed surrounding the 2008 and 2012 General Elections, either asking state elections officials to ensure the qualifications of Barack Obama and/or John McCain, or challenging their qualifications outright. The Third Circuit, in an order issued during one such challenge, stated that this was a political question not within the province of the judiciary. *See Berg v. Obama*, 586 F.3d 234, 238 (3d Cir. 2009) (noting "Berg's apparent lack of standing and also stating that Berg's lawsuit seemed to present a non-justiciable political question."). Multiple district courts also ruled that lawsuits challenging presidential qualifications presented nonjusticiable political questions. For example, in *Robinson v. Bowen*, 567 F. Supp. 2d 1144 (N.D. Cal. 2008), a case brought before the 2008 election seeking to remove Senator McCain from the California ballot on grounds that he did not qualify as a "natural-born citizen" within the meaning of Article II of the Constitution, Judge Alsup explained why, even if the plaintiff's lack of standing could be cured, the case was due to be dismissed in its entirety:

It is clear that mechanisms exist under the Twelfth Amendment and 3 U.S.C. § 15 for any challenge to any candidate to be ventilated when electoral votes are counted, and that the Twentieth Amendment provides guidance regarding how to proceed if a president elect shall have failed to qualify. Issues regarding qualifications for president are quintessentially suited to the foregoing process. Arguments concerning qualifications or lack thereof can be laid before the voting public before the election and, once the election is over, can be raised as objections as the electoral votes are counted in Congress. The members of the Senate and the House of Representatives are well qualified to adjudicate any objections to ballots for allegedly unqualified candidates. Therefore, this

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

order holds that the challenge presented by plaintiff is committed under the
Constitution to the electors and the legislative branch, at least in the first
instance. Judicial review—if any—should occur only after the electoral and
Congressional processes have run their course.
*Id.* at 1147.

The opinion in *Grinols v. Electoral College*, No. 2:12–cv–02997–MCE–DAD, 2013
WL 2294885, at *5-7 (E.D. Cal. May 23, 2013)[6] is also highly instructive. *Grinols* dismissed
a challenge to President Obama's qualifications as a "natural-born citizen" after finding it
presented a nonjusticiable political question and violated the separation of powers because the
Constitution expressly entrusted the issue of presidential qualifications and removal from
office to the legislative branch.[7] Plaintiff will undoubtedly attempt to distinguish this opinion
on grounds that it dealt with a plaintiff seeking removal of a sitting president from office,
rather than a challenge to the election of a supposedly disqualified president. But an earlier
opinion in *Grinols* refused to grant a temporary restraining order to prevent President Obama's
2012 re-election on the same "birther" theory because "numerous articles and amendments of
the Constitution together make clear that the issue of the President's qualifications and his
removal from office are textually committed to the legislative branch, and not the Courts."
*Grinols v. Electoral Coll.*, No. 12-CV-02997-MCE-DAD, 2013 WL 211135, at *4 (E.D. Cal.
Jan. 16, 2013). As a result:

These various articles and amendments of the Constitution make it clear that
the Constitution assigns to Congress, and not the Courts, the responsibility of

---

[6] Stating that "the Constitution assigns to Congress, and not to federal courts, the responsibility of
determining whether a person is qualified to serve as President of the United States. As such, the
question presented by Plaintiffs in this case—whether President Obama may legitimately run for office
and serve as President—is a political question that the Court may not answer."

[7] So, too, did *Kerchner v. Obama*, 669 F. Supp. 2d 477, 483 n.5 (D.N.J. 2009) (rejecting challenge to
President Obama's qualifications because, among other things, the claim was "barred under the
'political question doctrine' as a question demonstrably committed to a coordinate political
department."). The court observed that "[t]he Constitution commits the selection of the President to
the Electoral College in Article II, Section 1, as amended by the Twelfth Amendment and the
Twentieth Amendment, Section 3" and that "[n]one of these provisions evince an intention for judicial
reviewability of these political choices." *Id.*

determining whether a person is qualified to serve as President. As such, the question presented by Plaintiffs in this case—whether President Obama may legitimately run for office and serve as President—is a political question that the Court may not answer. If the Court were to answer that question, the Court would "[interfere] in a political matter that is principally within the dominion of another branch of government." This Court, or any other federal court, cannot reach a decision on the merits of a political question because doing so would ignore the Constitutional limits imposed on the courts. Accordingly, Plaintiffs ask the Court to answer a question the Constitution bars the Court from answering.

*Id.* (citation omitted).

Similarly, in *Taitz v. Democrat Party of Mississippi*, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373 (S.D. Miss. Mar. 31, 2015), another case that sought to have a candidate (President Obama) barred from the 2016 ballot based on the claim that he was not a "natural-born citizen," Judge Wingate's thorough opinion carefully analyzed the application of the political question and related separation of powers doctrines to such challenges. *Id*. at *12-16. Observing that the Twelfth and Twentieth Amendments charged the legislative branch with responsibility for the presidential electoral and qualification process ("[t]hese prerogatives are firmly committed to the legislative branch of our government"), *Taitz* held that "these matters are entrusted to the care of the United States Congress, not this court" and that the plaintiffs' disqualification claims were therefore nonjusticiable. *Id.*

Multiple state courts have also held that secretaries of state had no such power to disqualify a presidential candidate from a ballot because of the doctrine of separation of powers. For example, in *Strunk v. New York State Bd. Of Elections*, No. 6500/11, 2012 WL 1205117 (Sup. Ct. Kings County NY Apr. 11, 2012), the court found the Secretary of State did not have the authority to check qualifications because that authority presented a political question and a separation of powers issue. The court stated:

If a state court were to involve itself in the eligibility of a candidate to hold the office of President, a determination reserved for the Electoral College and Congress, it may involve itself in national political matters for which it is institutionally ill-suited and interfere with the constitutional authority of the

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Electoral College and Congress.

*Id.* at *12.

The California Court of Appeals' language in *Keyes v. Bowen*, 189 Cal.App.4th 647, 660

(2010), is also instructive:

> In any event, the truly absurd result would be to require each state's election official to investigate and determine whether the proffered candidate met eligibility criteria of the United States Constitution, giving each the power to override a party's selection of a presidential candidate. The presidential nominating process is not subject to each of the 50 states' election officials independently deciding whether a presidential nominee is qualified, as this could lead to chaotic results. Were the courts of 50 states at liberty to issue injunctions restricting certification of duly-elected presidential electors, the result could be conflicting rulings and delayed transition of power in derogation of statutory and constitutional deadlines. Any investigation of eligibility is best left to each party, which presumably will conduct the appropriate background check or risk that its nominee's election will be derailed by an objection in Congress, which is authorized to entertain and resolve the validity of objections following the submission of the electoral votes.

*See id.*; *accord, e.g., Jordan v. Secretary of State Sam Reed,* No. 12-2-01763-5, 2012 WL

4739216, at *1 (Wash. Super. Aug. 29, 2012) (rejecting birther claims seeking to exclude

President Obama from the Washington ballot; "I conclude that this court lacks subject matter

jurisdiction. The primacy of congress to resolve issues of a candidate's qualifications to serve

as president is established in the U.S. Constitution….")

Clearly, it is well-settled law that the Constitution vests responsibility for determining

whether a presidential candidate is qualified in the *federal* legislative branch—and only in the

*federal* legislative branch—and that the courts are barred from encroaching on duties

exclusively reserved for the federal legislature. As numerous courts have held, this fact alone

is sufficient ground for concluding that legal challenges such as the one currently before this

Court must be dismissed pursuant to the political question doctrine and related concepts of

separation of powers. Overall, this Court would be on solid legal footing in continuing the

longstanding American legal tradition of refusing to encroach on exclusively legislative

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

prerogatives.

**B.    THE FOURTEENTH AMENDMENT IS NOT SELF-EXECUTING WHEN USED OFFENSIVELY, AND REQUIRES ENFORCEMENT MECHANISMS FROM CONGRESS**

Even if this Court were not deterred by the political question doctrine, this case would still be patently improper. Indeed, Section Three of the Fourteenth Amendment is not self-executing, and cannot be applied to support a cause of action seeking judicial relief absent Congressional enactment of a statute authorizing said plaintiff to bring such a cause of action. A recent article by scholars Joshua Blackman and Seth Barrett Tillman summarizes the question of whether Section Three is self-executing as follows:

In our American constitutional tradition there are two distinct senses of self-execution. First, as a shield—or a defense. And second, as a sword—or a theory of liability or cause of action supporting affirmative relief. The former is customarily asserted as a defense in an action brought by others; the latter is asserted offensively by an applicant seeking affirmative relief.

For example, when the government sues or prosecutes a person, the defendant can argue that the Constitution prohibits the government's action. In other words, the Constitution is raised defensively. In this first sense, the Constitution does not require any further legislation or action by Congress. In these circumstances, the Constitution is, as Baude and Paulsen write, self-executing.

In the second sense, the Constitution is used offensively–as a cause of action supporting affirmative relief. For example, a person goes to court, and sues the government or its officers for damages in relation to a breach of contract or in response to a constitutional tort committed by government actors. As a general matter, to sue the federal government or its officers, a private individual litigant must invoke a federal statutory cause of action. It is not enough to merely allege some unconstitutional state action in the abstract. Section 1983, including its statutory antecedents, *i.e.*, Second Enforcement Act a/k/a Ku Klux Klan Act of 1871, is the primary modern statute that private individuals use to vindicate constitutional rights when suing state government officers.

Constitutional provisions are not automatically self-executing when used offensively by an applicant seeking affirmative relief. Nor is there any presumption that constitutional provisions are self-executing.[8]

---

[8] Blackman and Tillman, *Sweeping and Forcing the President Into Section 3: A Response to William Baude and Michael Stokes Paulsen*, at 13-14, last accessed September 30, 2023,

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Blackman and Tillman then proceed to thoroughly and comprehensively analyze whether Section Three is self-executing and explain at length why it is not.[9]

Among the arguments they analyze is the historical treatment of the issue by, among others, Chief Justice Chase, and the Congress of 1870, just two years after the 1868 ratification of the Fourteenth Amendment. One year after ratification, the Chief Justice of the Supreme Court of the United States, in a circuit court case, ruled that Section Three was not self-executing and that it could only be enforced through specific procedures prescribed by Congress or the United States Constitution. *See In re Griffin*, 11 F.Cas. 7 (C.C.Va 1869). Otherwise, if anyone had tried it at that time, it would have created an immediate and intractable national crisis. There is no contemporaneous record of any outcry or protest about this holding. Instead, Congress almost immediately provided the legislation suggested by the Chief Justice.

In 1870, Congress passed a law, entitled the "Enforcement Act," which allowed federal district attorneys to enforce Section Three. But the Enforcement Act did not give *state* election officials the authority to enforce the Fourteenth Amendment; it gave *federal* district attorneys that authority. Section 3 of the Enforcement Act allowed U.S. district attorneys to seek writs of *quo warranto* from federal courts to remove from office people who were disqualified by Section Three. Section 14 of the Enforcement Act required the courts to hear such proceedings before "all other cases on the docket." Section 15 provided for separate criminal trials of people who took office in violation of Section Three to take place in the federal courts.

---

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4568771 (emphasis in original; internal footnote omitted).

[9] *See generally id.*

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Federal prosecutors immediately started exercising *quo warranto* authority, bringing up on trial Jefferson Davis and others pursuant to that ability. These actions, however, waned after a few years. *See* Amnesty Act of 1872 (removing most disqualifications in the manner provided by Section Three; Pres. Grant Proclamation 208 (suspending *quo warranto* prosecutions)). The Amnesty Act of 1898 completely removed all Section Three disabilities incurred to that date.

In 1925, the Enforcement Act was repealed. In 2021, legislation was introduced to provide a cause of action to remove individuals from office who were engaged in insurrection or rebellion, but no further action was taken on that bill. *See* H.R. 1405, 117th Cong. 2021. Thus, there is presently no statute authorizing any person to bring actions seeking disqualifications under Section Three of the Fourteenth Amendment. Chief Justice Chase's order and the subsequent legislative history shows that Section Three is not self-executing unless Congress takes action to make it so and that it does not give secretaries of state the authority to remove a presidential candidate from the ballot. Creating a 51-jurisdiction patchwork of state election laws to enforce Section Three would simply fly in the face of this precedent and constitutional tradition, causing the exact crisis Justice Chase feared.

## C. PLAINTIFF'S CLAIMS ARE MERITLESS BECAUSE SECTION THREE OF THE FOURTEENTH AMENDMENT DOES NOT EVEN APPLY TO PRESIDENT TRUMP

This Court should cease entertaining this action because President Trump is not subject to Section Three. Section Three states:

No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House,

MAC:00002-216 17466-1 5226854_5

1  remove such disability.
2  U.S. CONST. amend. XIV, § 3

3  Under Section Three, a person is disqualified only if he "previously [took] an oath, as a

4  member of Congress, or as an officer of the United States, or as a member of any State

5  legislature, or as an executive or judicial officer of any State . . . ." Because President Trump

6  was never a congressman, state legislator, or state officer, Section Three applies only if he

7  was an "officer of the United States." *Id*. But as that term was used in Section Three, it did

8  not cover the President. Furthermore, Section Three can disqualify someone only if his oath

9  was "to support the Constitution of the United States." *Id*. As explained later, that is not the

10  oath that President Trump took.

11

12       The phrase "Officers of the United States," as used in the Constitution of 1788, does

13  not refer to elected positions. *See* Josh Blackman & Seth Barrett Tillman, *Is the President an*

14  *"Officer of the United States" for Purposes of Section 3 of the Fourteenth Amendment?*, 15(1)

15  N.Y.U. J.L. & LIBERTY 1 (2021). *That* meaning had not changed by 1868, when the

16  Fourteenth Amendment was ratified. *Id.* In fact, as Blackman and Tillman explain in their

17  later 2023 article:

18

19       Our 2021 article cites several sources from the period roughly
      contemporaneous with ratification to support the position that the President is
20       not an Officer of the United States. For example, we wrote:

21       In 1876, the House of Representatives impeached Secretary of War William
22       Belknap. During the trial, Senator Newton Booth from California observed,
      "the President is not an officer of the United States." Instead, Booth stated, the
23       President is "part of the Government." Two years later, David McKnight wrote
      an influential treatise on the American electoral system. He reached a similar
24       conclusion. McKnight wrote that "[i]t is obvious that . . . the President is not
      regarded as 'an officer of, or under, the United States,' but as one branch of
25       'the Government.'

26  Blackman and Tillman, *supra* at 112. They continue:

27

28       First, presidents fall under the scope of the Impeachment Clause precisely
      because there is express language in the clause providing for presidential

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

impeachments; the Impeachment Clause does not rely on general "office"- or "officer"-language to make presidents impeachable. We think this is the common convention with regard to drafting constitutional provisions. When a proscription is meant to control elected positions, those positions are expressly named, as opposed to relying on general "office"- and "officer"-language. Congress does not hide the Commander in Chief in mouseholes or even foxholes. For example, in 1969, future-Chief Justice William H. Rehnquist, then an Executive Branch attorney, addressed this sort of clear-statement principle. Statutes that refer to "officers of the United States," he wrote, generally "are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive." Five years later, future-Justice Antonin Scalia, then also an Executive Branch attorney, reached a similar conclusion with regard to the Constitution's "office"-language. These Executive Branch precedents would counsel against deeming the President an "officer of the United States."

Second, as to the Appointments Clause, which uses "Officers of the United States"-language, Presidents do not appoint themselves or their successors. The Supreme Court hears a never-ending stream of cases that ask if a particular position is a principal or inferior officer of the United States—even though the Appointments Clause does not even distinguish between those two types of positions. Where has the Court ever suggested that the President falls in the ambit of the Appointments Clause's "Officers of the United States"-language?

To the contrary, the Court has asserted just the opposite. In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, Chief Justice Roberts observed that "[t]he people do not vote for the 'Officers of the United States.'" Rather, the Appointments Clause requires appointment of these individuals. Chief Justice Roberts reaffirmed this position in *Seila Law LLC v. CFPB*. He wrote, "Article II distinguishes between two kinds of officers—principal officers (who must be appointed by the President with the advice and consent of the Senate) and inferior officers (whose appointment Congress may vest in the President, courts, or heads of Departments)." Both categories of positions are appointed.

And, finally, as to the Commissions Clause, which also uses "Officers of the United States"-language, Presidents do not commission themselves, their vice presidents, their successor presidents, or successor vice presidents.

*Id*. at 116-117. Blackman and Tillman write further about the clauses in Section Three:

The second clause does not expressly list several categories of positions: *e.g.*, presidential electors, appointed officers of state legislatures, members of state constitutional conventions, and state militia officers. The first clause does not expressly list several categories of positions: *e.g.*, members of the state legislatures, and members of state constitutional conventions. Neither list expressly mentions the President and Vice President.

MAC:00002-216 17466-1 5226854_5

*Id.* at 126.

Even if this Court were to determine that President Trump was an officer of the United States, Section Three does not, by its terms, apply to all officers of the United States, but rather only to those who have taken "previously taken an oath . . . to support the Constitution of the United States." President Trump did not take the specified oath; instead, the oath President Trump took is that mandated by Article II, Clause Eight of the United States Constitution. That oath states:

> Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:— I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and *will to the best of my Ability, preserve, protect and defend the Constitution of the United States.*
> U.S. CONST., art. II, cl. 8 (emphasis added).

The words used in the presidential oath differ from those in the oaths other members of the federal and state governments take:

> The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, *to support this Constitution . . . .*
> *Id.* at art. VI, cl. 3 (emphasis added).

As noted, Section Three contains the same emphasized phrase:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, *to support the Constitution of the United States . . .*
> U.S. CONST. amend. XIV, § 3.

Thus, the Constitution requires members of Congress and those appointed to offices under the United States to take an oath to "support" the Constitution, but it requires the President to take an oath to "preserve, protect and defend" the Constitution. This is significant for two reasons. First, it is further evidence that the President was not understood or intended

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:00002-216 17466-1 5226854_5

by the drafters of the Fourteenth Amendment to be an Officer of the United States. And second, because having "previously taken an oath . . . to *support* the Constitution of the United States" is a further limitation upon the class of persons subject to Section Three, it excludes President Trump—who never took such an oath—from that class of persons.

Section Three's second clause is about those who took a particular oath. Insofar as it applies to federal officials, Section Three depends on a preexisting oath—that specified in Article VI—and then describes the same people covered by the Article VI Oath Clause. It is therefore unlikely that Section Three, in adopting categories that do not encompass the President, would have been understood to apply to the President. Constitutional drafting history confirms what the text suggests. When the Impeachment Clause was drafted, it initially referred to the President, Vice President, and "other civil officers of the U.S." 2 The Records of the Federal Convention of 1787, at 545 and 552 (Farrand ed., 1911). But upon further deliberation, the drafters changed the Impeachment Clause to remove the word "other." *Id*. at 600. There would have been no reason to do that if the President were an "officer of the United States."

If the Framers of the Constitution wanted the oath to be the same for the President of the United States as it is for senators, representatives, state legislators, and executive and judicial officers, they would have so spoken. The words that they chose must be given their proper meaning and where they chose different phrases those phrases must be accorded different meanings.[10] And if the framers of Section Three wanted the President of the United States to be subject to disqualification, they would have so specified. Instead, they used a

---

[10] *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 4, 334, 4 L. Ed. 97 (1816) ("From this difference of phraseology, perhaps, a difference of constitutional intention may, with propriety, be inferred. It is hardly to be presumed that the variation in the language could have been accidental.")

MAC:00002-216 17466-1 5226854_5

phrase—officer of the United States—understood not to include the President and further limited the scope of the provision to those officers who had taken the Article VI oath to "support" the Constitution. President Trump was not an officer of the United States and never took the Article VI oath. Section Three therefore does not apply to him.

**D.      PLAINTIFF ALSO LACKS STANDING BECAUSE HE CANNOT PLAUSIBLY ESTABLISH INJURY, CAUSATION OR REDRESSABILITY, AND HIS CLAIMS, TO THE EXTENT THEY WERE EVER VALID OR PLAUSIBLE, ARE NOW DEFINITIVELY MOOT IN LIGHT OF RECENT DEVELOPMENTS**

The U.S. Constitution limits the judicial power of federal courts to actual cases and controversies. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016), as revised (May 24, 2016) ("[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (citation and quotation omitted).[11] A valid case or controversy arises only when the party seeking federal jurisdiction (typically, the plaintiff) evidences "… such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends…" *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 205 (1962). The "personal stake" requirements is satisfied when there is "(1) an injury that is (2) 'fairly traceable to the defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed by the requested relief.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992); *see also California Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1049 (9th Cir. 2023).

Concrete injuries must be "*de facto*; that is, [they] must actually exist." *Spokeo*, 578 U.S. 330, 340 (2016). The Ninth Circuit has affirmed that "[a] concrete injury need not be

---

[11] *See also Hybe Co. v. Does 1-100*, 598 F. Supp. 3d 1005, 1007 (D. Nev. 2022) ("The judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.'") (citation and quotation omitted).

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

tangible" and can instead be "intangible." *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1270 (9th Cir. 2019). But in determining whether such an intangible harm rises to the level of a concrete injury, the Supreme Court has held that "both history" (particularly "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as provided a basis for a lawsuit in English of American courts" and the "judgment of Congress play important roles." *Spokeo* at 340-41. "Congress," the Court has said, "is well positioned to identify intangible harms that meet minimum Article III requirements and may 'elevate' to the status of legally cognizable injuries that were previously inadequate in law." *Id.* at 341 (citing *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 775-777 (2000).

Plaintiff's allegation of an intangible injury fails to meet each of the injury, causation, and redressability triad factors. First, he fails to allege an injury that is sufficiently individual and particularized *to him* to confer standing. Plaintiff claims only to suffer a competitive harm because he purportedly must compete with President Trump (in actuality they will not be in competition with each other, as Trump is participating in the party-run caucus, while Plaintiff seemingly may participate in the separate, state-run primary). But he fails to plausibly allege that this injures him in any particularized or concrete fashion. He has not identified a single voter who identifies Castro as his or her "second choice" after Donald Trump. And he has proffered no expert or social science evidence[12] that could support the inherently improbable claim that there is a latent Castro movement that would surface, if only Trump was not on the ballot. Ultimately, he alleges only the same, generalized injury as anyone else, and that is

---

[12] As recently as May of this year, the Ninth Circuit has suggested that in the context of a preliminary injunction, and when dealing with "highly technical" subject matter, expert testimony may be necessary to guide the district court's analysis. See *Lorador v. Kolev*, No. 22-15491, 2023 WL 3477834, at *1-2 (9th Cir. May 16, 2023).

MAC:00002-216 17466-1 5226854_5

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

insufficient to confer standing.

Second, Plaintiff also fails to allege facts sufficient to establish that it is President Trump, as opposed to other factors, that are causing his asserted injury. Castro claims to be a candidate in the Nevada presidential preference primary. Plaintiff makes no claim–let alone a *plausible* claim–that preventing the secretary of state from including President Trump on the ballot materially reduces *his* chances of winning the primary and being awarded Nevada's delegates to the Republican National Convention. The truth is, of course, that no one has ever heard of Mr. Castro and, even if one were to assume that President Trump was not on the ballot, there is absolutely no reason to suppose that any meaningful number of votes would go to him, as opposed to candidates who are actually recognized in the polls and on the streets. Absent any such plausible factual allegation, he has not met his obligation to show a causal relationship between President Trump being on the ballot and his inevitable failure to win the Nevada primary. And to reiterate, as this point, such analysis is essentially an academic legal exercise, as President Trump is not even participating in the primary that Castro claims he needs emergency relief to block his access to.

Finally, any injury to the Plaintiff caused by the inclusion of President Trump on the ballot is not redressable by this Court. The removal of President Trump from the Nevada ballot would not result in Mr. Castro winning even a single delegate in this State. Certainly, he has not alleged—much less proven—any plausible mechanism by which it would.

Plaintiff's claim that he has "competitive injury" standing is misplaced. Generally, cases finding competitive standing in the election law context have been brought by political parties seeking to exclude competing parties and candidates from the general election ballot. *See*, *e.g.*, *Texas Dem. Party v. Benkiser*, 459 F.3d 582, 586-87 n.4 (5th Cir.2006); *Schulz v. Williams,* 44 F.3d 48, 53 (2nd Cir.1994); *Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir.1990).

MAC:00002-216 17466-1 5226854_5

But Plaintiff has identified no instance in which competitive injury standing has been extended to a political party's primary election, where the question is not who will win a public office, but rather who will be that party's nominee. Nor has he cited a case in which competitive standing was established in a contest to elect delegates to a national political convention. And certainly, neither Congress nor common law or history support such a proposition.

Nor, in this instance, does common sense. Even if Plaintiff's status as a putative "competitor" serves to distinguish him in some measure from those whose generalized claim to standing derives merely from their status as voters, it does not remedy the standing defects posed by the sheer implausibility—unleavened by any measure of reality—of Plaintiff's claims of injury, causation, and redressability. At some point, when a plaintiff claims that he has standing because, if only the Court would order his opponent to do X he would float into the sky, reality and common sense require there to be a better reason to believe that his feet will actually leave the ground than that the plaintiff merely says it is so.

Finally, and as noted above, to the extent that Plaintiff ever had a valid claim to judicial relief (which for all the foregoing reasons, clearly he did not), Plaintiff's claims are now definitively moot in light of President Trump's decision to participate in Nevada's party-run caucus, as opposed to the state-run primary that Plaintiff seeks to deny him ballot access to. The Ninth Circuit has observed that that "mootness doctrine asks the basic question whether decision of a once living dispute continues to be justified by a sufficient prospect that the decision will have an impact on the parties." *Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137, 1141 (9th Cir. 2009) (citation omitted). In the instant case at bar, said question can be definitively answered in the negative. Indeed, even were this Court to grant Plaintiff the full extent of the relief he has requested, it would have no material "impact on the parties," precisely because President Trump, by way of his participation in the party-run caucus, will

MAC:00002-216 17466-1 5226854_5

be completely unaffected by any blocked ability to participate in the primary set forth in NRS 298 *et seq.* As such, Plaintiff's claims are completely moot, and the Application should be denied on this basis alone.

## V.   **CONCLUSION**

For all of the foregoing reasons, namely Plaintiff's abject failure to satisfy the legal standards for either Emergency Relief under LR 7-4, injunctive relief (in the form of a preliminary injunction or temporary restraining order), or an expedited, consolidated trial on the merits, this Court should summarily deny Plaintiff's Application in its entirety.

Dated this 2nd day of October, 2023.

MARQUIS AURBACH

By */s/ Brian R. Hardy*
   Brian R. Hardy, Esq.
   Nevada Bar No. 10068
   Harry L. Arnold, Esq.
   Nevada Bar No. 15866
   10001 Park Run Drive
   Las Vegas, Nevada 89145
      *Attorneys for Defendant*
      *Donald John Trump*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **DEFENDANT DONALD JOHN TRUMP'S OPPOSITION TO EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND EXPEDITED PRELIMINARY INJUNCTION HEARING CONSOLIDATED WITH A PRELIMINARY BENCH TRIAL ON THE MERITS (ECF 9, 11)** with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the 2nd day of October, 2023.

☒       I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

John Anthony Castro
12 Park Place
Mainsfield, TX 76063
j.castro@castroandco.com
*Pro Se Plaintiff*

*/s/ J. Madsen*
An employee of Marquis Aurbach

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:00002-216 17466-1 5226854_5